**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 8:06CR257 |
| | ) | |
| vs. | ) | |
| | ) | **REPORT AND** |
| **BRANDON WATSON,** | ) | **RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

This case is before the court on the defendant's Amended Motion to Suppress Evidence and Statements (#18). The motion was heard on November 8, 2006 and the Transcript of the hearing (#24) was filed on November 18, 2006. The briefing schedule expired on January 2, 2007, at which time the motion was deemed submitted.

The defendant, Brandon Watson, moves the court for the suppression of evidence and statements obtained by the Omaha police department on June 16, 2006. Specifically, Watson alleges that a vehicle he was operating was stopped without probable cause or reasonable suspicion of criminal activity, that he was unlawfully detained after the traffic stop, and that his vehicle was unlawfully searched, all in violation of his rights under the Fourth Amendment to the United States Constitution.

Watson further alleges that subsequent to his detention, arrest, and search, statements were unlawfully obtained from him in violation of *Miranda,* and his residence at 3344 Manderson Street, Omaha, Douglas County, Nebraska was unlawfully searched.

Watson finally contends that the destruction by law enforcement of the videotape of his stop, detention, and search violated his right to due process.

## FACTUAL BACKGROUND

Officer Debbie Cass testified she is an eight-year employee of the Omaha Police Department and previously served 4½ years with the Des Moines, Iowa police department. On Friday, June 16, 2006, Officer Cass was in uniform operating an Omaha police cruiser in the area of 31st and Nicholas. At about 11:00 a.m. (46:23), Cass was parked at a stop sign at the intersection of Nicholas Street and Oregon Trail, facing west, when she observed an eastbound red Chevy Tahoe traveling east on Myrtle Avenue run the stop sign at Oregon Trail and Myrtle (7:20-8:22). The vehicle then came to a stop in the middle of the street before turning right and proceeding southeast on Oregon Trail (8:17-25).[1]

Cass testified that after waiting for the vehicle to pass in front of her, she pulled behind it and ran the plates (9:4-8). She observed a driver, but could not see the interior of the vehicle because of a dark tint on the windows (9:17-22). She noted that earlier in the year she had heard a police broadcast involving a red Chevy Tahoe, being driven by a Brandon Watson. The earlier broadcast also contained a plate number and information that someone in the vehicle had pointed an AK-47 at the reporting party (10:9-14). Later, on that day, Cass had observed the Tahoe; however it was parked (11:16-23).

After pulling in behind the Tahoe, Cass turned on her emergency equipment and initiated a stop (12:3-11). She testified that when the emergency lights are turned on, a cruiser camera is operational. At the time of the stop she believed the camera was operational (14:7-16) and capable of recording voices outside the cruiser through the use of a microphone (14:17-25).

---

[1] Myrtle Avenue and Nicholas Street carry east-west traffic. Myrtle is one block north of Nicholas, and Oregon Trail runs diagonally between them. See Exhibits 3 & 4.

As Cass approached the driver's side of the vehicle, she observed the driver stick his hands out the open window (15:10-12). She greeted the driver stating, "How are you doing, Brandon?" The driver advised her he had a handgun, stating that it was on the dash in plain view and that there was a clip near the gun (15:16-19). Cass observed a female in the front passenger seat and a baby in a rear seat. Cass told Watson to get out of the vehicle. After he complied, she handcuffed him and took control of the gun and clip (16:6-8). Cass walked Watson to her cruiser and placed him in the back seat. As Cass removed Watson from his vehicle, she smelled the odor of marijuana emanating from the vehicle (21:5-7). She noted that based on her work in the narcotics division in Des Moines, courses she had completed through the DEA, and her work in law enforcement, she is aware of the smell of marijuana and smells it daily (21:8-15).

Cass then briefed Officer Paul Antoniak, who had arrived at the scene. Cass noted that when she removed Watson from the vehicle she patted him down, but it was Antoniak who searched him incident to the arrest (18:13-18).

Cass testified that after Watson was secured, she searched the vehicle (19:17-19). During the search she smelled fresh marijuana and located three gallon-sized bags of marijuana behind the driver's seat on the back floor board. Additionally, in a little tray under the console, she found four small baggies of marijuana and some green and pink pills she believed were ecstasy (20:9-16). After finishing the search, she gathered the evidence and contacted her sergeant, who called Officer Kula of the narcotics unit. A short time later Kula arrived at the scene (22:4-7).

Cass testified that after completing her duties at the scene, she did nothing to preserve the recording of her encounter with Watson. Because "there really wasn't

anything of significance as far as a fight or struggle," she did not preserve the recording (24:1-16). She noted that she does not routinely preserve tapes of traffic stops (25:2-7).

On cross-examination Officer Cass testified that when she first saw the Tahoe, she was on Nicholas Street, one block south of Myrtle, at the intersection of Nicholas and Oregon Trail, to the east side of Oregon Trail (28:9-17).

On cross-examination Cass testified that she believed the earlier transmission regarding Watson's vehicle and the AK-47 occurred in January, February or March, when it was cold (30:14-18). She noted that she remembered the name of the owner of the vehicle, the plate number, and the color of the vehicle (31:4-10).

Cass admitted that after Watson was placed in the cruiser, a records-check of the seized gun disclosed that it was registered to Watson (33:2-8). Cass also admitted that while she smelled marijuana as she approached the vehicle, she did not so inform Watson. Nor did she ask him if he had been smoking (35:1-6).

On cross-examination Cass testified that Exhibit 102[2] is a standard operating procedure policy for the Omaha police department regarding videos. The procedure provides, in part:

> Video tapes/Digital Files will be retained for a minimum of thirty (30) calendar days from the date of recording. During the thirty days, the tapes/Digital Files will not be recycled for re-recording and will not be discarded or deleted. Each precinct will designate a command officer to maintain a system for preserving video tapes for a minimum of thirty days prior to re-recording or discarding. Digital files will automatically purge after 30 days.

Exhibit 102 at Part II.

---

[2] The parties stipulate that the exhibit is the video policy of the Omaha Police Department (37:15-23).

Gary Kula testified that he is a twelve-year employee of the Omaha police department, currently serving in the narcotics unit. On June 16, 2006 he was called to the scene of a traffic stop involving Brandon Watson. Upon arrival he was advised that officers had conducted a traffic stop and seized a substantial quantity of marijuana and possible ecstasy (52:3-7). He contacted Watson, who was handcuffed in the back of a police cruiser, and asked him about possible cooperation with law enforcement (53:6-17). Kula told Watson he was a police officer, advised him of his *Miranda* rights[3], and told him that he wanted to talk to him regarding his arrest and items found in the vehicle (55:11-56:11). Kula asked Watson if he was willing to speak with him. Watson responded "yes." (56:12-14). Kula observed that during the questioning Watson was cooperative, not anti-police or highly upset, "just normal speaking" in a conversational tone (56:15-21). Kula did note that at times Watson would tear up, but did not actually cry (56:23-25). Kula did not smell alcohol; nor did he observe Watson comport himself in a manner to make Kula believe he was under the influence of narcotics or a controlled substance (57:7-13). After Watson agreed to speak Kula conducted an interview, which lasted about 30 minutes (57:14-22).

---

[3]Officer Kula testified that he gave Watson the *Miranda* warnings from memory, as follows:
> I advised [Watson] I was a police officer. I advised him he had the right to remain silent and not make any statements or answer any of my questions. I advised him that anything he said could and would be used against him in court. I told him that he had the right to have an attorney and have that attorney with him during questioning. And if he could not afford an attorney, one would be appointed to represent him.
> * * * *
> And then I asked him, knowing those rights, if he would be willing to speak with me now.
> * * * *
> I asked each question individually and waited for a response from Mr. Watson. He either responded in the affirmative by shaking his head yes or actually orally saying yeah or yes, but it was all in the affirmative.

(55:18-56:11).

During the interview Kula talked about Watson's residence and said he (Kula) was interested in knowing what happened to the AK-47. Watson told Kula he acquired the rifle from a pawn shop and legally possessed it. Kula then asked Watson for his consent to search the residence. Watson was concerned about the search because the residence was his aunt's and uncle's and not his. Watson told Kula that he would give permission to search, but that he would like his uncle, Marcus Chandler, to also grant permission (58:15-23). Following Watson's consent, Kula requested additional officers and advised those officers that they were going to Watson's residence at 3344 Manderson Street (58:24-59:5). After arriving along with Watson at 3344 Manderson, Kula completed a permission to search form allowing the search of the residence and went through the form line-by-line with Watson (59:6-19). Kula watched as Watson signed the form (60:24-61:3).

Kula testified that after Watson signed the form, they approached 3344 Manderson Street and contacted Watson's uncle, Marcus Chandler (61:10-17). Outside the residence Kula showed Chandler the form, told him that his nephew, Watson, had been very cooperative, that police knew that there was a firearm in the home based upon discussions with Watson, and that the police would like to go in and get the firearm and some scales (61:10-23). Kula observed Chandler's demeanor to be very cooperative. Chandler told Kula that there was no problem, that he knew there was a firearm in the house. Chandler signed the form (62:1-3), entered the house, and took Kula to a back bedroom where the AK-47 and other items were seized.

Tamika Smith testified that she is a cousin of Brandon Watson. On June 16, 2006 Watson had stopped to see her and her baby at her residence at 3610 Nicholas (69:2-13). Because she was arguing with her boyfriend, she asked Watson to take her and her baby

to her aunt's house on Manderson. According to Smith, they traveled west, away from her residence (70:11-13). As Watson drove away from her residence, he told her that she had a flat tire on her car so they looped back to her house so Watson could show her the tire (70:3-10). In returning to Smith's residence, Watson traveled west on Nicholas to 31st, North on 31st to Myrtle, and then east on Myrtle.[4]

According to Smith, Watson's vehicle and a police cruiser driven by a female officer passed by each other on Myrtle (71:9-15); the cruiser made a U-turn and began to follow Watson (78:10). Smith testified that she recalls coming to the intersection at Myrtle and Oregon Trail, and that Watson stopped or slowly moved forward to see if any traffic was coming because there is a bush on the left side and a tree on the right side, and the stop sign is not at the corner (72:14-25). After turning on Oregon Trail, Watson stopped at the stop sign at Nicholas and Oregon Trial, before turning to drive past her house (73:12-16).

Smith testified that they drove by her house, and she suggested that Watson stop at the house because she had a warrant, but Watson told her everything in the car was registered and legal and there was nothing to worry about (74:4-9). Watson then drove to 31st and Nicholas, stopped at the stop sign and turned onto Lincoln Boulevard. Watson then turned onto Lincoln Boulevard near 33rd. Smith recalls that the officer turned on her lights as Watson's vehicle turned off Nicholas onto 31st near Lincoln Boulevard (75:2-5). Smith testified that when the officer approached the vehicle, Watson asked her what was the problem. The officer stated that Watson had run a stop sign at Myrtle and Oregon Trail

---

[4] I note that this testimony is not consistent with Smith's assertion that she lived at 3610 Nicholas, an address which would actually be located several blocks west of the general area in question.

(75:10-13; 85:7-11).   Smith noted the officer never mentioned the smell of marijuana (75:17-19), and that neither she nor Watson ever gave permission to search the vehicle (76:12-16).  While in the vehicle Smith noticed nothing suspicious and did not smell anything (70:19-25).  Smith also diagramed the area and marked the spot where Watson's vehicle and the officer's cruiser passed (Ex. 3).

On recall by the defendant, Officer Cass admitted that as part of the stop of the Watson vehicle, she prepared a written report and that the report indicates that she was in the area of 31st and Nicholas when she first observed the red Chevy Tahoe (93:1-4). She testified, however, that she first saw the red Chevy Tahoe when she was at the intersection of Nicholas and Oregon Trail (93:5-14).  On cross-examination Officer Cass testified that she was in the area of approximately Nicholas and Oregon Trail when she first saw Watson's vehicle and that it was located one block to her north at Myrtle and Oregon Trail (93:20-25).  Officer Cass also drew a diagram of the area, including the location of her vehicle and the Watson vehicle (Exhibit 4).

## LEGAL ANALYSIS

Defendant Watson contends his vehicle was stopped without reasonable suspicion or probable cause, in violation of his Fourth Amendment rights; consequently, all evidence obtained in this matter should be suppressed as "fruit of the poisonous tree," under *Wong Sun v. United States*, 371 U.S. 471 (1963).  He further contends his *Miranda* rights were violated and that his residence was illegally searched.  Finally, Watson argues that the destruction by law enforcement of the videotape of his stop, detention, and search violated his right to due process.

### A. Legality of Traffic Stop

"For purposes of constitutional analysis, a traffic stop is characterized as an investigative detention, rather than a custodial arrest." *United States v. Jones*, 269 F.3d 919, 924 (8th Cir. 2001); *see United States v. Wheat*, 278 F.3d 722, 726 (8th Cir. 2001), *cert. denied*, 537 U.S. 850 (2002). As such, a traffic stop is governed by the principles of *Terry v. Ohio*, 392 U.S. 1 (1968). *Jones*, 269 F.3d at 924. Under *Terry*, 392 U.S. at 21-22, a police officer may conduct an investigative stop if the officer has a reasonable suspicion that the person stopped is, or is about to be, engaged in criminal activity. *See also Delaware v. Prouse*, 440 U.S. 648, 663 (1979). Reasonable suspicion requires a particularized and objective basis for suspecting the person stopped of criminal activity, but the level of suspicion required for a *Terry* stop is less demanding than that for probable cause. *United States v. Gonzalez*, 220 F.3d 922, 925 (8th Cir. 2000) (internal quotations and citations omitted). "A reasonable suspicion may be justified even if there are innocent explanations for a defendant's behavior when the circumstances are considered in the totality." *United States v. Tuley*, 161 F.3d 513, 515 (8th Cir. 1999).

In this instance, Officer Cass testified that she stopped Watson's vehicle because she saw it travel east on Myrtle Avenue and run the stop sign at Oregon Trail and Myrtle. At the time she observed the traffic violation, Cass was parked in one block to the south, at Oregon Trail and Nicholas Street, facing west.

Tamika Smith, the passenger in Watson's vehicle, denied that Officer Cass was parked at Oregon Trail and Nicholas Street, apparently because she (Smith) observed a female officer driving a police cruiser in a different location while Smith and Watson were

driving around the neighborhood. Smith also testified that Watson did stop at the stop sign, which "is like some feet before the corner.... and then ... slowly moved forward to see if any traffic was coming" because there were shrubs on both sides of the street. "So he crept up to the corner and then turned the corner." (72:16-25).

Smith's testimony, on the whole, is lacking in clarity. Her testimony does not eliminate the possibility that there was more than one police car or more than one female police officer patrolling in the area. Having carefully considered Exhibits 3 and 4, the witnesses' testimony, and observing the witnesses' demeanor, I find the testimony of Officer Cass to be credible. Officer Cass had reason to recall the description of Brandon Watson's vehicle because of the earlier broadcast reporting that an AK-47 was present in the vehicle. I particularly credit the officer's testimony that she was parked at Oregon Trail and Nicholas Street and saw Watson's vehicle proceed through the intersection of Oregon Trail and Myrtle Avenue without stopping. Tamika Smith's description of the manner in which Watson drove through the intersection tends to demonstrate it was not unreasonable for Officer Cass to conclude that Watson had run the stop sign.

Even "[a] mistaken premise can furnish grounds for a *Terry* stop, if the officers do not know that it is mistaken and are reasonable in acting upon it." *United States v. Ornelas-Ledesma*, 16 F.3d 714, 718 (7th Cir. 1994), *judgment vacated on other grounds*, 517 U.S. 690 (1996) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 184-86 (1990)); *accord United States v. Bailey*, 417 F.3d 873, 977 (8th Cir. 2005), *cert. denied*, 126 S. Ct. 1894 (2006); *see also United States v. DeLeon-Reyna*, 930 F.2d 396, 399 (5th Cir. 1991) (en banc) (per curiam); and *United States v. Walraven*, 892 F.2d 972, 974-75 (10th Cir.

1989)). Here, Officer Cass had an objectively reasonable basis for believing a traffic offense had occurred. Even if she was mistaken, any mistake of fact or mistake of law on her part does not affect the validity of the traffic stop.

> Within the Eighth Circuit,
>
> the distinction between a mistake of law and a mistake of fact is irrelevant to the fourth amendment inquiry. As we held in *United States v. Sanders*, 196 F.3d 910, 913 & n.3 (8th Cir. 1999), the validity of a stop depends on whether the officer's actions were objectively reasonable in the circumstances, and in mistake cases the question is simply whether the mistake, whether of law or of fact, was an objectively reasonable one. "The determination of whether probable cause [or reasonable suspicion] existed is not to be made with the vision of hindsight, but instead by looking to what the officer reasonably knew at the time." *Id.* at 913.

*United States v. Smart*, 393 F.3d 767, 770 (8th Cir.), cert. denied, 545 U.S. 1121 (2005); *see also United States v. Martin*, 411 F.3d 998, 1101 (8th Cir. 2005).

Since Officer Cass had an objectively reasonable basis for believing a traffic offense had occurred, the traffic stop did not violate the defendant's Fourth Amendment rights.

### B. Search of Vehicle

The "automobile exception" to the warrant requirement authorizes officers to search a vehicle without a warrant if they have probable cause to believe the vehicle contains evidence of criminal activity. *United States v. Hill*, 386 F.3d 855, 858 (8th Cir. 2004). "'If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth amendment ... permits police to search the vehicle without more.'" *Maryland v. Dyson*, 527 U.S. 465, 467 (1999) (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996)).

In this case, Officer Cass testified that she first smelled the odor of marijuana emanating from the vehicle when she removed Watson from the vehicle. Cass also testified it was illegal to transport a gun with a loaded magazine and have it in the vehicle. Cass became aware of these items in conjunction with the traffic stop and without entering the vehicle. Based on these factors, I find that the officers had probable cause to believe the defendant's vehicle contained evidence of criminal activity, and the search of the vehicle was permissible under the automobile exception.

### C.  *Miranda*

The protections of *Miranda v. Arizona*, 384 U.S. 436 (1966), "are triggered only when a defendant is both in custody and being interrogated. *United States v. Lawrence,* 952 F.2d 1034, 1036 (8th Cir.), *cert. denied*, 503 U.S. 1011 (1992). 'Interrogation' is 'express questioning,' or words or actions 'that the police should know are reasonably likely to elicit an incriminating response....' *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *Lawrence,* 952 F.2d at 1036...." *United States v. Hatten*, 68 F.3d 257, 261-62 (8th Cir. 1995), *cert. denied,* 516 U.S. 1150 (1996) (parallel citations omitted); *see also United States v. Boyd*, 180 F.3d 967, 976-77 (8th Cir. 1999); *United States v. Head*, 407 F.3d 925, 929 (8th Cir. 2005), *cert. denied*, 126 S. Ct. 1799 (2006).

"A *Miranda* warning must precede any custodial interrogation. A custodial interrogation involves questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *United States v. Chamberlain*, 163 F.3d 499, 502 (8th Cir. 1999) (citing *Miranda*).

The government bears the burden of proving by a preponderance of the evidence that, under the particular facts and circumstances of this case, the defendant's waiver of his *Miranda* rights was "an intentional, voluntary, knowing, and intelligent relinquishment or abandonment of a known right or privilege." *United States v. Black Bear*, 422 F.3d 658, 663 (8th Cir. 2005). "To determine whether a waiver or a confession was voluntary, a court looks at the totality of the circumstances and must determine whether the individual's will was overborne." *United States v. Syslo*, 303 F.3d 860, 866 (8th Cir. 2002). The court must examine both "'the conduct of the law enforcement officials and the capacity of the suspect to resist pressure to confess.'" *Id.* (quoting *United States v. McClinton*, 982 F.2d 278, 282 (8th Cir. 1992)).

> To state the obvious, "interrogation of a suspect will involve some pressure because its purpose is to elicit a confession." ... [T]he fact that the tactics produced the intended result ... does not make [a] confession involuntary." ... In other words, "there is nothing inherently wrong with efforts to create a favorable climate for confession." ... "'[Q]uestioning tactics such as a raised voice, deception, or a sympathetic attitude on the part of the interrogator will not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne.'" ... Nor will a promise of leniency, an "expressed disbelief in the statements of a suspect ..., or lie[s] to the accused about the evidence against him" necessarily render a confession involuntary.... Rather, the coercive conduct must be "such that the defendant's will was overborne and his capacity for self-determination critically impaired."

*United States v. Santos-Garcia*, 313 F.3d 1073, 1079 (8th Cir. 2002) (citations omitted).

### 1. Statements Made to Officer Cass

The uncontroverted testimony of Officer Cass was that the defendant stuck his hands out the window of the vehicle as she approached. She did not direct him to do so.

When Cass said, "How are you doing, Brandon?" he responded by telling her he had a handgun on the dash, that it was in plain view and that the clip was out of it.

I find that the defendant's actions and statements to Officer Cass were not the result of "interrogation" or any "words or actions" that the officer should have known were reasonably likely to elicit an incriminating response. The record shows that this statement was volunteered.

### 2. Statements Made to Officer Kula

Based on the testimony of Officer Kula, which I find to be credible, I find that Watson was advised of his constitutional rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), before being interviewed. There is no evidence that Watson did not understand the advice of rights.

Even though Watson was advised of his *Miranda* rights, the court must examine the conduct of the law enforcement officials to determine whether or not there was an overreaching by law enforcement officials amounting to coercive police activity. In determining whether a defendant made statements voluntarily, the court must determine if the accused was coerced or his will was overborne. *United States v. Wilson*, 787 F.2d 375, 380-81 (8th Cir.), *cert. denied*, 479 U.S. 857 (1986). Coercive police conduct will render a confession inadmissible. *Blackburn v. Alabama*, 361 U.S. 199 (1960). Coercive police pressure is a predicate to the finding that a confession is not voluntary and violates the accused's due process rights. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). However, any police questioning has coercive aspects to it simply by reason of the confrontation. The police officer is part of the law enforcement system that will cause a

charge to be made against a suspect. The questioning by a police officer, while uncomfortable, is not coercive per se. *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). The court must consider the totality of the circumstances, including the specific interrogation tactics employed, the details of the interrogation, and the characteristics of the accused. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973).

I find the testimony of Officer Kula to be credible. The record shows that Watson was given his *Miranda* warnings by Officer Kula, understood his rights and agreed to be interviewed. There is no evidence of coercion or police misconduct. Considering the totality of the circumstances, I find that the defendant voluntarily waived his *Miranda* rights before giving statements to Officer Kula.

### D.  Search of Residence

The Fourth Amendment protects people from unreasonable searches of their "persons, houses, papers and effects." U.S. Const. amend. IV. A warrantless search of a house is presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586 (1980), and absent exigency or consent, warrantless entry into the home is impermissible under the Fourth Amendment. *Steagald v. United States*, 451 U.S. 204, 211-212 (1981). Police may conduct a search of someone's home, without a warrant or even without probable cause, if that person voluntarily consents to the search. *See United States v. Chaidez*, 906 F.2d 377, 380 (8th Cir. 1990); *United States v. Bradley*, 234 F.3d 363, 366 (8th Cir. 2000); *see also United States v. Deanda*, 73 F.3d 825 (8th Cir. 1996). To determine whether a consent is voluntary, the court must examine the totality of the circumstances, including the characteristics of the accused and the nature of the encounter. *See Bradley*, 234 F.3d at

366. The government has the burden of proving the consent was voluntary. *United States v. Parris*, 17 F.3d 227, 229 (8th Cir.), *cert. denied*, 51 U.S. 1077 (1994); *United States v. Heath*, 58 F.3d 1271, 1275 (8th Cir.), *cert. denied*, 516 U.S. 982 (1995). "The prosecution need not prove that the individual is fully aware of his or her rights under the Fourth Amendment in order to establish a voluntary consent." *Heath*, 58 F.3d at 1275 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 235 (1973)).

The record shows that both the defendant and his uncle, who shared the residence at 3344 Manderson Street, signed a consent form (Ex. 2) allowing the search of the residence. Based on Officer Kula's testimony, I find that the defendant's consent was voluntarily given, as was that of the defendant's uncle.

### E.  Preservation of Evidence

Citing *California v. Trombetta*, 467 U.S. 479 (1984), Watson contends that the destruction by law enforcement of the videotape of his stop, detention, and search violated his right to due process. In this regard, Officer Cass testified that she did nothing to preserve the recording because there was not anything of significance as far as a fight or struggle. Cass also stated that she does not routinely preserve tapes of traffic stops.

In *Trombetta*, the Court considered whether the Due Process Clause required law enforcement agencies to preserve breath samples of suspected drunken drivers in order for the results of breath-analysis tests to be admissible in criminal prosecutions. The Court held it did not:

> Given our precedents in this area, we cannot agree with the California Court of Appeal that the State's failure to retain breath samples for respondents constitutes a violation of the Federal Constitution. To begin with, California authorities in this case did not destroy respondents' breath

> samples in a calculated effort to circumvent the disclosure requirements established by *Brady v. Maryland* and its progeny. In failing to preserve breath samples for respondents, the officers here were acting "in good faith and in accord with their normal practice." ... The record contains no allegation of official animus towards respondents or of a conscious effort to suppress exculpatory evidence.
>
> More importantly, California's policy of not preserving breath samples is without constitutional defect. Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality ... , evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. Neither of these conditions is met on the facts of this case.

*California v. Trombetta*, 467 U.S. at 488-89 (footnote and citations omitted).

"[T]he state's failure to preserve evidence does not constitute a denial of due process unless the state acted in bad faith, the evidence had apparent exculpatory value and comparable exculpatory evidence was not reasonably available to the defendant. Failure to preserve potentially useful evidence is not a denial of due process unless there is a showing of bad faith." *United States v. Malbrough*, 922 F.2d 458, 463 (8th Cir. 1990), *cert. denied*, 501 U.S. 1258 (1991) (citing *California v. Trombetta*, 467 U.S. at 488-89, and *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)); *see also United States v. Purkey*, 428 F.3d 738, 747-78 (8th Cir. 2005), *cert. denied*, 127 S. Ct. 433 (2006).

Here, there is no evidence that law enforcement acted in bad faith or that the videotape had any apparent exculpatory value. Consequently, I find that the destruction of the videotape did not offend the defendant's right to due process.

## RECOMMENDATION

For the reasons discussed above,

-17-

**IT IS RECOMMENDED** that the defendant's Amended Motion to Suppress Evidence and Statements [18] be denied in its entirety.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten (10) business days after being served with the recommendation. The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the statement of objection a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.

**DATED February 1, 2007.**

                                        **BY THE COURT:**

                                        **s/ F.A. Gossett**
                                        **United States Magistrate Judge**